Our first case this morning is Bates v. the Army. Mr. Cox? Yes, Your Honor. Good morning. May it please the court, Kevin Cox for the appellant RL Bates, general contractor Paving & Associates. As the court is well aware, this case involves an appeal from the ASBCA regarding the denial of a claim seeking equitable adjustment for West Point. One of the main points that it seemed like the board didn't appreciate as much as I hoped it would in this case was that this was an 8A procurement. As I'm sure the court is aware, the 8A program was designed to assist the small contractors. In this case, RL Bates, the principal of the company, is a disabled quadriplegic, had started a paving business, had been doing government contracts for a number of years in the 8A program. Well, I mean, I appreciate what you're saying, but you say that they didn't appreciate it. I'm not sure that that in and of itself, I mean, as a matter of law, that doesn't get you around other requirements that they have to follow, right? Absolutely. Absolutely. My response to that would be, and where I was going, I think, with that point was that during the negotiations, this is a negotiated procurement. The government was going to sit down with RL Bates, which it did, sat down with Mr. Stivers, who testified during the trial, and he's actually here in the courtroom somewhere today. And they sat down and started to systematically reduce the prices that Mr. Stivers came to the table with based on nothing. Mr. Stivers testified that the numbers appeared to have been pulled out of thin air, I think is what he said. And the government representative, Mr. Thoman, never even produced an estimate, during the negotiations, at any point, but just seemed to say, your prices are too high, you've got to get them down. And Mr. Stivers' response to that was, well, look, I can get the prices down, but you've got to promise me that you're going to give me production rates to meet the lower prices. They promised him, yes, you're going to do that. You're going to have long stretches of roads to pave at West Point, and your production rates... Are you asking us here, Mr. Cox, to find facts about negotiations which aren't in the record? It's a little difficult for us to grapple with a factual recitation like that. Well, I don't want you to find facts, Your Honor. What I want for the court to pay attention to in this case was that the judge, for whatever reason, seemed to completely ignore the testimony of Mr. Stivers. Mr. Stivers, as I said, negotiated the contract. He put the prices together. He was the only one at the table throughout the period of negotiations. The government had an authorized negotiator. Her name was Patricia Wood. But where does that argument get you? Is that your diversion argument that they lowered the negotiations, came about, or your client was of the view that they were going to throw more work his way? So is that part and parcel of the diversion issue? Diversion, with all respect, is kind of a separate issue. The issue of the negotiated price is actually dovetailed into three or four areas of the claim. As you know, there's eight or ten areas that are on appeal here. But the negotiations, problems actually stemmed from there as it related to other claims, such as the additional quality control personnel that they had to hire, and the negligent estimates that we talked about. All this stuff went back to the idea of production rates. In the business of paving, as I learned through this case, is that the production rate is really the key thing. Now, they promised during this negotiation, you're going to have these high production rates. It's going to be just like the two jobs you did previously. I mentioned those in the brief, but I think they're both... Can you point to anything in the contract that gives heft to your argument that they didn't produce the amount that your client relied on? There's nothing in the contract itself. As I said, there's line item prices that were agreed to that became part of the contract. But again, I stress this was an 8A negotiated procurement for a disabled contractor. The goal of this program, and this was the last contract that he was supposed to have, and then he was going to graduate and then be able to compete in the open marketplace and bid on these contracts by himself. But again, the promises that were made during the negotiations got Bates to lower its prices way down from what their prices should have been. This was based on representations that were made. Now, the only testimony at trial was from Mr. Stivers, from an authorized negotiator. The government did not call Patricia Wood their negotiator. They chose not to do that. So the only testimony at trial from an authorized negotiator at these negotiations was from Mr. Stivers. But the question remains as to whether this became a provision in the contract. The line items themselves became part of the contract after they were negotiated. Not the line items, but the representations you are talking about with respect to the amount of work and the level of production and all of that. Is that part of the contract? In fact it is. The production rates that were discussed and negotiated, and I say that quote-unquote negotiated, those caused Bates to lower its prices. Those prices took into  account. Does the contract say that? I mean obviously the contract has a price for the rate. Well, the contract has about 66 different line items and for each one there is a unit price. Are any of them tied into a level of production in the contract? All of them. All of the unit prices that were negotiated. In the contract? In the contract. They became part of that contract. There was supposed to be a back and forth. Now, in that regard, I would say that this was the first. We are in the contract. I am confused here. The prices that were eventually negotiated and agreed upon became part of the contract. I know the prices are in the contract. What I am getting at is the production rates that you say were breached by the government. The production rates are what led to Bates having to reduce its line item prices. So they are built into those numbers. You are not going to find a production rate per se. Mr. Cox, I have over the years had dozens of requirements contracts and the issue is always the same. The issue is always did they order all the business that we thought we were entitled to do? And it always comes down to was the golf cart path part of the paving? And it seems to me that the government has made a pretty good case here that the contracting officer that the golf cart path was not part of the normal paving that you were what was part of the requirements contract. And the separate housing that was done by the Corps of Engineers was also not part of the roads and paving that was expected as part of your perceived that they did not meet the terms of the requirements contract. I understand the argument and I would agree, Your Honor, that is always the case. Now the golf course restoration that you referred to, it was kind of a side issue from the diversions. The golf course was a separate delivery order that they entered into and there are other problems associated with that. As far as the diversions go that you mentioned. That was a Corps of Engineers project. That was kind of a separate thing not even controlled by this contracting officer. So there seems to be a reason for them to have treated that outside the requirements contract. Well, the government argues and the board agreed with them that it really didn't matter that we had a requirements contract at bus point to do all the paving and all the sidewalks and everything else. If some other agency like the Corps of Engineers wanted to come to West Point and do paving and give it to somebody else, they were free to do that. Now I disagree with that. I think that there's an implied duty of good faith and fair dealing in any contract. Now in this case, it would seem to me that West Point would have had the duty, and they didn't do this, to go out and notify these other agencies, look, we're in the process of awarding an 8A contract to a disabled 8A contractor. We're going to give them the chance to succeed here. We're going to give them all this work. So you're on notice. That was never done. You're on notice for what? That if you have any projects, you're committed to also giving them to this contract? That we have a requirements contract at this location at West Point, and any paving work or sidewalk work or curbing work. That would be the issue. Show me in the contract where it says any paving work of any kind, whether it's a golf cart path or something being done by the Corps of Engineers in a separate project, is going to go to you. The contract itself spells out the description of work. It can be found on page 66 of the appendix. And in that case, it says the work to be performed consists of maintenance and repair to existing roads and parking areas. It goes on to say there's an outline of the features of work to be constructed. And this is not intended to be a complete description of all work to be done. It goes on and lists removal and replacement of curbs and pavement, replacement of bituminous concrete pavement. But notice those are existing roads, and they're replacement of existing facilities. A new golf cart path and a new Corps of Engineers facility is not an existing road or a replacement of an existing curb. Well, actually, Your Honor, with respect, I think all the work that they did was for existing. It was repair work. The golf carts had to be repaired, for instance. They were there. In some fashion, they were there. We were supposed to go in and box them out and fill them in. But we were repairing those. The work that we did was we would pull up, mill some of the concrete, put the asphalt down, and lift the curbs. So everything we did was in the way of maintaining or fixing what was already there. There was nothing new, at least that I can recall to the best of my recollection. There was nothing new that was done. And there was a renovation project that the Corps did there, for instance, that involved paving parking lots. Again, there was no effort made by the contracting personnel at West Point to notify any of these other parties that are doing business at West Point that, look, we've got a duty to R.L. Bates under this contract to give him all this work. And they allowed this to go on. And that was part of the argument with the diversions. Can we hear from Mr. Grimaldi? Yes, thank you. Okay, and we'll reserve the rest of the rebuttal. Thank you very much. Mr. Grimaldi? May it please the Court. Good morning, Your Honors. I think Your Honors hit the nail on the head here when you said, when you asked, are you asking, is Bates asking us to find facts? That's exactly what Bates is doing here. Multiple times during their briefing, they've said, the Board ignored this fact, or the Board ignored that fact, or misinterpreted the facts in this situation. None of their arguments overcome the deferential standard for the Board here. They have not shown that the Board acted arbitrarily and capriciously, has not found that there were made in bad faith. Turning to one that was discussed chiefly here, the defective quantity estimates, Bates has claimed, well, first, turning to the contract itself, Your Honors, that the line items do have the prices in them. And I understand Bates' argument that those prices are based upon discussed estimates here. But what Bates is actually arguing here is that one of two things. First, that there was a credibility determination made by the Board here is incorrect. They're saying that Mr. Stiver's testimony regarding the intentions of Mr. Toman, who was a project engineer for the government, should be- Well, if the contract is ambiguous, and there's only testimony for one version and nothing for the other, then that's a problem for the government, is it not? Well, that's not our case, Your Honor. In our situation, we don't have an ambiguous contract, and we have testimony from Mr. Toman as well. Now, Bates would like you to discount the testimony of Mr. Toman because he wasn't an authorized negotiator at this August 9th meeting. But Mr. Toman was there. Now, the Board found him to be a credible factual witness because of his presence at this meeting, presumably. And Bates has shown nothing to overcome the highly deferential standard for credibility determinations. Can I ask you a background question? Please. You've got several entities here, at least with the diversion stuff or whatever. So you've got the Military Academy that entered into these contracts for West Point, and then you've got the Corps of Engineers. Do both of those entities have identical authority to grant a contract for the same project, or is there sort of jurisdiction separate? It depends on where the money comes, Your Honor. If the money comes from military construction, only the Army Corps of Engineers can issue contracts for that. Now, the contract itself is very clear that the requirements to be met here are that of the Directorate of Contracting for the Army, not the Corps of Engineers. And that can be seen in C-1 of the contract, FAR 52216-21A, which says the contracting activity for the requirements will be in the schedule, and that's on JA-83. And then F-4 of the contract says the delivery orders will be issued by the contracting officer. And G-2 says the contracting officer is the United States Military Academy Directorate of Contracting. It doesn't list any other entities, no other contracting activities. Why didn't you have a responsibility, as Mr. Cox suggests, to contact the Corps of Engineers and say to them, you're doing some paving work, we have a requirements contract? Your Honor, the Corps of Engineers was using military construction funds for military construction projects, so there would be no appropriations to do those roads by the DOC. The money that's been appropriated to do that work is military construction and has to be done by the Corps of Engineering. If we gave them a call, it would have been fruitless. They would have said, sorry, but we have appropriations that need to be spent in a certain way here. But the certain way doesn't dictate who's going to be the contractor. In this situation, it does, Your Honor, because if it's military construction, it would have to be done by the Army Corps of Engineers. Now, BASE could have had a separate contract with the Army Corps of Engineers, and then it would have been the same contractor, but it would have to have been a different contract vehicle. In this case, that makes it a different contractor. How does the contractor know that if they're somewhat a newcomer to the game? Well, I don't believe that they were a newcomer to the game here, Your Honor. I believe they were graduating from the 8A program, so they are an experienced contractor here. And the contract itself spells out they'll be issued by the DOC, no other entities. BASE has also stated that there has been a breach of this good faith and fair dealing for these diversions. Well, first, this is not in their certified claim. Their certified claim is for diversions of work. They mentioned this good faith and fair dealing when there was a board found three projects that BASE alleged to be diversions that the board found only evidence of there being a solicitation, not actually any contractor work done. And BASE replies that there's a breach of good faith and fair dealing based upon this. This is not a diversion. A diversion is when work is actually taken away from the contractor. Here, there's no evidence any work was actually taken away. So, good faith and fair dealing cannot be a diversion, and beyond that, it's raised for the first time in its reply brief, and it's been waived. BASE also notes that Mr. Stiver's testimony was ignored in two different situations. The first was the additional quality control costs, and this is about the size of the delivery orders. If you look at the pages cited in the JA for Mr. Stiver, he does not testify as to any agreement to have larger delivery orders as opposed to small ones. He testifies as the impact upon his company for that. So, Mr. Stiver's testimony was not ignored as to this alleged agreement. He simply didn't testify to that. So, that does not overcome the highly deferential standard of review for a factual, financial part of the board. And the second time, which I started mentioning a little bit, is the testimony of Mr. Tolman in that the board found he did his best with the estimates for the paving, that there was no bad faith or negligent estimates on the part of the government because of Mr. Tolman's extensive experience in the area. He knew which roads needed to be done, and he knew that the work would be done when funding was available. On the opposite end, Mr. Stiver's just testified, well, I believe Mr. Tolman was just trying to lower our prices for no reason in particular than to have lower prices. It's not unreasonable for the board to find Mr. Tolman's credibility, Mr. Tolman's testimony more credible than that of Mr. Stiver's. If your honors have no further questions, we respectfully request that the board, excuse me, the court, confirm the decision of the board. Thank you. Thank you, Mr. Grimaldi. Mr. Cox, you have a little over four minutes. Okay. Thank you very much. Just a couple of points in response. Bates is not asking the court to find facts here. What we're saying is that the findings of fact that were made by the board were not based on substantial evidence. The example I gave of Mr. Stiver's is probably the best example. Let me stress one point. Mr. Grimaldi mentions John Tolman. John Tolman was not present during these negotiations. John Tolman was present at the final negotiation meeting that took place, I believe, in August. These negotiations had been going on for, I believe, months prior to that time between Mr. Stiver's and Patricia Wood, the government's authorized negotiator. She is the only one who could testify about what was said at those negotiations besides Mr. Stiver's. Mr. Tolman was not there until the last meeting. She may have consulted with him, but she was not present during these months and months of negotiations with Bates. Another example of this decision that's not based on substantial evidence was the example that I gave regarding this DEFAR clause. Now, a few of the items that were negotiated by Bates were survey costs, bonding costs, and maintenance and protection of traffic. All three of those things, Mr. Stiver's was told during the negotiation that he would bill for those separately, that those were not going to be billed in to a line item. And I pointed out to the court and to the board before that there's a DEFAR provision in the contract which specifically says if there's going to be a line item that's buried in another line item, it's got to be spelled out. It's going to say survey, NSP, bonding, NSP. None of those things appear in the contract. Now, there's conflicting clauses that create an ambiguity, but Mr. Stiver's inquired during these negotiations about that. How are we going to get paid for surveying? How are we going to get paid for bonding? How are we going to get paid for maintenance and protection? Don't worry about it. You bill separately. We'll pay you for it separately. And in support of that, I would point out that this contract was based on a DOT, New York State DOT contract. Now, the government stipulated to this during the trial, and basically the DOT contracts have those three items priced out separately. They're separate line items. They get paid separately. They're not buried within other line items. So I use, and again, the government stipulated to that fact. Despite this, the court, or the board I should say, didn't even mention the DFAR clause in its decision as it related to those three separate claim items. Didn't mention it at all. So, as I said, that was one of the items that we believe was not based on substantial evidence. And unless the court has any further questions, I would rest. Thank you, Mr. Cox. Thank you very much. Our next case is Juvie v. Target Corporation.